UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CLINTON EASTWOOD and HOWARD BERNSTEIN,
as TRUSTEES of the 1988 CLINTON EASTWOOD TRUST,
and DOES 1 through XXXX, inclusive,

      Plaintiffs,

v.

MOLECULAR DEFENSES CORPORATION,
MOLECULAR DEFENSES CORPORATION,
MOLECULAR DEFENSE HOLDINGS, LLC,
MOLECULAR DEFENSES GROUP INC.,
THYOGEN GROUP CORPORATION, and KEVIN DAVIS,

      Defendants.

Case No.: 18-cv-6652

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs Clinton Eastwood and Howard Bernstein (collectively, "Plaintiffs"), as Trustees of the 1988 Clinton Eastwood Trust ("Eastwood Trust"), by their attorneys Robins Kaplan LLP, and Does 1 through XXXX, inclusive, bring this Complaint against Defendants Molecular Defenses Corporation, Molecular Defenses Corporation, Molecular Defense Holdings, LLC, Molecular Defenses Group Inc., ThyoGen Group Corporation, and Kevin Davis (collectively, "Defendants"), and allege as follows:

## <u>NATURE OF THE ACTION</u>

1.     This action arises from Defendants' theft and unlawful use and enjoyment of several patents relating to glutathione – an antioxidant used to combat diabetes and other diseases.

2.     The late Dr. Harry B. Demopoulos, a renowned professor and medical doctor whom Defendants credit with creating the field of free radical pathology, devoted a substantial portion of his life's work to the research and development of glutathione.

3.     For the greater part of the last three decades, both Plaintiff Clinton Eastwood

(professionally known as Clint Eastwood) and the Eastwood Trust supported Dr. Demopoulos' mission with friendship and substantial investments, primarily through Dr. Demopoulos' various business entities.  In the words of Defendant Kevin Davis, Mr. Eastwood is "the man who made it possible to prove glutathione could be absorbed."

4.      Dr. Demopoulos succeeded in procuring six U.S. patents and two international patents related to pharmaceutical preparation and methods for administering glutathione, which he assigned to his company Antioxidant Pharmaceuticals Corporation ("APC").  APC, and many of Dr. Demopoulos' other relevant entities – for all of which the Eastwood Trust is a substantial shareholder – were in the business of researching, developing, and marketing glutathione supplements and other related products.

5.      Defendants claim that Dr. Demopoulos sought to restructure and consolidate his numerous businesses in late 2015 under the umbrella of his newly formed New York business entity, Defendant Molecular Defenses Corporation, with the urging and participation of a newcomer to the glutathione business, Defendant Kevin Davis.

6.      In the midst of this allegedly voluntary restructuring, however, Dr. Demopoulos unexpectedly suffered a massive stroke in early 2016.  It was at this tragic time when Defendants pounced, seizing Dr. Demopoulos' business (and six U.S. glutathione patents) for their own ends.

7.      In fact, and just two weeks after Dr. Demopoulos' stroke, Defendant Kevin Davis incorporated the other Defendant Molecular Defenses Corporation – a Nevada entity bearing the same name as the co-Defendant, New York business incorporated by Dr. Demopoulos.  That very same day, Defendant Molecular Defense Holdings, LLC was also incorporated in Delaware.

8.      Unbeknownst to Plaintiffs, and while Dr. Demopoulos was seemingly undergoing recovery in the hospital, Defendants caused the preparation of a subscription agreement –

purportedly signed by Dr. Demopoulos by his "Attorney in Fact" – providing for the assignment of the six U.S. glutathione patents from APC to Defendant Molecular Defense Holdings, LLC in exchange for membership rights in this Defendant-entity.

9.      While the subscription agreement provided that APC was to obtain units and become a member of Defendant Molecular Defense Holdings, LLC, there is no evidence that this occurred.  Even more troubling, and without Plaintiffs' knowledge, APC was already technically dissolved fifteen years prior, but there was no corporate wind-up and distribution of assets (including the six U.S. glutathione patents) to its shareholders, such as the Eastwood Trust.

10.      Dr. Demopoulos passed away a short time later, leaving unfinished (and in shambles) his alleged efforts to consolidate his business and account for the resulting rights and equity owed the shareholders.

11.      Also incomplete was Dr. Demopoulos' pursuit of a new seventh U.S. patent and two international patent applications derived from or related to the technology protected by the existing six U.S. glutathione patents.  According to U.S. Patent and Trademark Office records, the new U.S. derivative patent recently issued, but unlike its initial application that only listed Dr. Demopoulos as inventor, it now apparently has two claimed inventors:  Dr. Demopoulos and Defendant Kevin Davis.   Similarly, the pending international patent applications list Dr. Demopoulos and Defendant Kevin Davis as claimed inventors.

12.      Just months ago, Defendant Kevin Davis took it upon himself to assign his purported interest as co-inventor of the new U.S. derivative patent surreptitiously to Defendant Molecular Defenses Corporation, which is apparently the Nevada entity he incorporated just two weeks after Dr. Demopoulos' stroke.

13.      Since Dr. Demopoulos' stroke, the Eastwood Trust has undertaken herculean

efforts to obtain information from Defendants concerning the business operations, shareholders, and intellectual property of Dr. Demopoulos' companies, including with respect to the Defendant-entities. But Defendants refuse to provide even the bare-minimum; instead, they spent the last two years employing a strategy of inordinate delay with kind words, empty promises, and the trickling of incomplete, contradictory, and the vaguest of information. All the while, during which time they solicited additional investments from the Eastwood Trust, Defendants have been working to develop and profit from all of the glutathione patents that rightfully belong to the shareholders of APC, including the Eastwood Trust.

14.     Defendants' malfeasance has left Plaintiffs no alternative but to commence this action. In doing so, Plaintiffs also seek redress for other shareholders whom Defendants are likewise swindling through outright usurpation, covert intellectual property transfers, and corporate shell games.

## **THE PARTIES**

15.     Plaintiff Clinton Eastwood, professionally known as Clint Eastwood, is an individual residing in the State of California and a Trustee of the 1988 Clinton Eastwood Trust.

16.     Plaintiff Howard Bernstein is an individual residing in the State of California and a Trustee of the 1988 Clinton Eastwood Trust.

17.     The 1988 Clinton Eastwood Trust owns and holds at least 1,000,000 shares in APC.

18.     The 1988 Clinton Eastwood Trust owns and holds at least 400,000 shares in ThyoGen Pharmaceuticals Inc.

19.     The 1988 Clinton Eastwood Trust owns and holds at least 1,291,367 shares in The Glutathione Corporation.

20.     The 1988 Clinton Eastwood Trust owns and holds at least 1,291,367 shares in Redox & Signaling Pharmaceutical Holdings Corporation.

21.     Plaintiffs Does 1 through XXXX, inclusive ("Doe Plaintiffs"), are the other shareholders of APC, ThyoGen Pharmaceuticals Inc., The Glutathione Corporation, and Redox & Signaling Pharmaceutical Holdings Corporation.  Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of Doe Plaintiffs, or any of them, and therefore bring this suit on their behalf, and by each of them, with such fictitious names.  Upon information and belief, various family members of the late Dr. Harry B. Demopoulos, including Dr. Byron P. Demopoulos and Dr. Richard D. Demopoulos, reside in the State of New York and are shareholders of The Glutathione Corporation.  Plaintiffs will seek leave of the Court to amend this Complaint when the identities of Doe Plaintiffs are ascertained.

22.     Upon information and belief, Defendant Molecular Defenses Corporation ("MDC-Nevada") is a Nevada corporation with its principal place of business at 8 Westchester Plaza, Elmsford, New York 10523.

23.     Upon information and belief, Defendant Molecular Defenses Corporation ("MDC-New York") is a New York corporation with its principal place of business at 8 Westchester Plaza, Elmsford, New York 10523.

24.     Upon information and belief, Defendant Molecular Defense Holdings, LLC is a Delaware limited liability company with its principal place of business at 157 West 57th Street, Suite 6F, New York, New York 10019.

25.     Upon information and belief, Defendant Molecular Defenses Group Inc. is a New York corporation with its principal place of business at 8 Westchester Plaza, Elmsford, New York 10523.

26.     Upon information and belief, Defendant ThyoGen Group Corporation is a New York corporation with its principal place of business at 8 Westchester Plaza, Elmsford, New York

10523.

27.     Upon information and belief, Defendant Kevin Davis is an individual residing at 39 West 68th Street, Apartment 4A, New York, New York 10023.  Defendant Kevin Davis is the President, Chief Executive Officer, and a director of Defendant MDC-Nevada, and the President and Chief Executive Officer of Defendant ThyoGen Group Corporation.

28.     Upon information and belief, Defendants MDC-Nevada, MDC-New York, Molecular Defense Holdings, LLC, Molecular Defenses Group Inc., and ThyoGen Group Corporation are the alter-egos of each other, and there exists (and at all relevant times existed) a unity of interest, ownership, and control among them such that any individuality and separateness ceased to exist.  Accordingly, one or more of these Defendants is nothing more than a shell, instrumentality, or conduit by which the other Defendants carry on their business.

## JURISDICTION AND VENUE

29.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Patent Laws of the United States, namely 35 U.S.C. §§ 119, 256, and 285.  This Court has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the federal claims alleged in this action that they form part of the same case or controversy.

30.     This Court has personal jurisdiction over Defendants MDC-Nevada, MDC-New York, Molecular Defense Holdings, LLC, Molecular Defenses Group Inc., and ThyoGen Group Corporation because they continuously and systematically transact business within the State of New York and this judicial district at their principal places of business.  This Court has personal jurisdiction over Defendant Kevin Davis because he resides in the State of New York and this judicial district.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

## THE FACTS

I.   **The Players.**

   A.  **Plaintiff Clint Eastwood and the Eastwood Trust**

32.     Clint Eastwood is a celebrated actor and filmmaker whose professional career spans seven decades.  His films garner international acclaim, and he is the recipient of multiple Academy Awards for Best Director and Best Picture, as well as several nominations for Best Actor.

33.     While largely known for his iconic on-screen performances, Mr. Eastwood is also a philanthropist and investor in the field of healthcare, primarily through the Eastwood Trust.

34.     Plaintiffs are the only Trustees of the Eastwood Trust, which owns and holds a substantial number of shares in many of the glutathione-related companies founded and operated by the late Dr. Harry B. Demopoulos.

   B.  **Dr. Harry B. Demopoulos and His Glutathione-Related Business**

35.     Upon information and belief, Dr. Harry B. Demopoulos ("Dr. Demopoulos") was a renowned professor and physician who was instrumental in developing the New York University Comprehensive Cancer Center and Cancer Institute of New Jersey.  Upon further information and belief, Dr. Demopoulos founded the International Study Center for Environmental Health Sciences, and assisted in the development of the Doris Duke Charitable Foundation.  In company documentation, Defendants credit Dr. Demopoulos as "the creator of the field of free radical pathology, the foundation for not just the molecular approach to the treatment of disease, but for what much of we know about oxidative stress, free radicals and anti-oxidants."

36.     While his lesser-known accolades include fleeting performances in films with his longtime friend and supporter, Plaintiff Clint Eastwood, Dr. Demopoulos operated various businesses devoted to the research of glutathione – an antioxidant used to treat diabetes and other serious diseases – including the development of glutathione into pharmaceutical commerce.

37.     Dr. Demopoulos' pertinent glutathione-related companies include the following:

- Antioxidant Pharmaceuticals Corporation ("APC"):   Upon information and belief, APC was in the business of research, development, and the pursuit of antioxidant nutrient supplements for the over-the-counter consumer healthcare market.   APC was a New York corporation that conducted business operations at an expansive facility and laboratories located at 7 Westchester Plaza in Elmsford, New York ("APC's Facility").[1]  Unbeknownst to Plaintiffs, APC was dissolved by proclamation on December 26, 2001.

- Health Maintenance Programs, Inc.:   Upon information and belief, Health Maintenance Programs, Inc. formed as APC's over-the-counter healthcare products division to produce and market supplements in the United States and Europe.  Health Maintenance Programs, Inc. conducted business operations at APC's Facility.

- ThyoGen Pharmaceuticals Inc. ("ThyoGen Pharmaceuticals"):   Upon information and belief, ThyoGen Pharmaceuticals formed as an APC division to conduct clinical trials and manufacture pharmaceutical drugs to target central nervous system and cardiovascular problems.  ThyoGen Pharmaceuticals was a New York corporation that conducted business operations at APC's Facility.[2]  Unbeknownst to Plaintiffs, ThyoGen Pharmaceuticals was dissolved by proclamation on December 26, 2001.

- The Glutathione Corporation ("Glutathione Corporation"):   According to Defendants, Glutathione Corporation was engaged in the production and sale of glutathione as a dietary supplement.  Glutathione Corporation conducted business operations next door to APC's Facility at 8 Westchester Plaza in Elmsford, New York.  Unbeknownst to Plaintiffs, Glutathione Corporation was dissolved by proclamation on June 29, 2016.

- Redox & Signaling Pharmaceutical Holdings Corporation ("Redox & Signaling"):   Redox & Signaling conducted business operations at the same address as Glutathione Corporation, next door to APC's Facility.  Unbeknownst to Plaintiffs, Redox & Signaling was dissolved by proclamation on June 29, 2016.

38.     Dr. Demopoulos may have operated other glutathione-related companies, such as

---

[1] Initially, APC was registered with the Department of State and conducted its business under the name Health Maintenance Programs, Inc.  On or about July 27, 1993, APC officially changed its entity name registration from Health Maintenance Programs, Inc. to APC.

[2] Initially, ThyoGen Pharmaceuticals was registered with the Department of State and conducted its business under the name Thyone Corporation.  On or about December 12, 2000, ThyoGen Pharmaceuticals officially changed its entity name registration from Thyone Corporation to ThyoGen Pharmaceuticals.

Molecular Defenses, Ltd. and Cell. Redox Corporation, International.  However, upon information and belief, these entities were never registered or authorized to do business in any state.

### C. Defendants and Related Parties

39.     According to Defendants, MDC-Nevada (and/or MDC-New York) formed in order to realign and/or consolidate Dr. Demopoulos' glutathione business.  MDC-Nevada and MDC-New York conduct business operations at the same address as Glutathione Corporation and Redox & Signaling, next door to APC's Facility.

40.     According to Defendants, Defendant Molecular Defense Holding, LLC has an interest in MDC-Nevada (or, alternatively, MDC-New York).  As set forth below, Defendant Molecular Defense Holding, LLC purportedly procured all right, title, and interest through an assignment and subscription agreement in six U.S. glutathione-related patents that Dr. Demopoulos invented.

41.     Defendant Molecular Defenses Group Inc. conducts business operations at the same address as MDC-Nevada and MDC-New York, next door to APC's Facility.

42.     Defendant ThyoGen Group Corporation ("ThyoGen Group") conducts business operations at the same address as MDC-Nevada, MDC-New York, and Molecular Defenses Group Inc., next door to APC's Facility.

43.     Defendant Kevin Davis is the President and Chief Executive Officer of MDC-Nevada and ThyoGen Group.  Defendant Kevin Davis is also a director of MDC-Nevada.

44.     Thomas De Shazo is the Vice President and a director of MDC-Nevada.

45.     Gabriel Del Virginia is the Treasurer, Secretary, and general and corporate counsel of MDC-Nevada.  Mr. Del Virginia also purports to represent ThyoGen Group.

**II.    Plaintiff Clint Eastwood Provides Significant Financial Backing to Dr. Demopoulos'
Pursuit of the Research, Development, and Commercial Production of Glutathione.**

46.    On or about July 28, 1981, Dr. Demopoulos founded APC, which upon information
and belief, was in the business of research, development, and the pursuit of antioxidant nutrient
supplements for the over-the-counter consumer healthcare market.

47.    As early as the mid-1980s, Plaintiff Clint Eastwood was called-upon, and began to
provide, substantial financial support to Dr. Demopoulos and his work researching and developing
various pharmaceuticals and antioxidants, including glutathione.

48.    Initially, Mr. Eastwood personally loaned APC (in its then-name Health
Maintenance Programs, Inc.) the sum of $300,000 by way of a demand note dated September 11,
1985 ("First APC Note").

49.    In or around 1993, according to correspondence from Dr. Demopoulos, APC
reorganized its structure to keep its then-budding pharmaceutical endeavors with ThyoGen
Pharmaceuticals separate from its supplement business with Health Maintenance Programs, Inc.

50.    While APC's business was undergoing this change and rapid expansion, Clint
Eastwood remained constant in his support of Dr. Demopoulos and his glutathione business.

51.    Indeed, on June 15, 1994, Mr. Eastwood made another personal loan to APC in the
sum of $43,440 by way of a promissory note ("Second APC Note").

52.    On March 15, 1996, Mr. Eastwood even loaned Dr. Demopoulos, personally, the
sum of $150,000 by demand note.

53.    Dr. Demopoulos used Mr. Eastwood's supply of capital in pursuit of glutathione.

54.     Indeed, Dr. Demopoulos filed applications for the following six U.S. patents relating to glutathione that eventually issued ("U.S. APC Patents") with the U.S. Patent and Trademark Office  ("USPTO") between December 31, 1997 and July 22, 2002:

| Application Date | Issued Patent No. | Title |
|---|---|---|
| 12-31-1997 | 6,159,500 | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |
| 06-28-1999 | 6,350,467 | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |
| 12-09-1999 | 6,204,248 | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |
| 03-19-2001 | 6,423,687 | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |
| 02-25-2002 | 6,896,899 | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |
| 07-22-2002 | 6,586,404 | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |

55.     On December 8, 1999, Dr. Demopoulos executed an assignment to APC of all rights, title, and interest in the U.S. APC Patents.

56.     Between December 12, 2000 and May 24, 2005, the U.S. APC Patents issued.

57.     Additionally, Dr. Demopoulos filed applications for the following two international patents relating to glutathione that eventually issued ("International APC Patents") with the Canadian Patent Office and the European Patent Office (designating the following contracting states: AT, BE, CH, DE, DK, ES, FI, FR, GB, GR, IE, IT, LI, LU, MC, NL, PT, and SE) on December 31, 1997:

| Application Date | Patent No. | Title |
|---|---|---|
| 12-31-1997 | CA 2276183 C | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |
| 12-31-1997 | EP 0957901 B1 | Pharmaceutical Preparations of Glutathione and Methods of Administration Thereof |

58.     The International APC Patents issued on June 9, 2009 and November 18, 2009, in

the Canadian Patent Office and the European Patent Office, respectively.  As of July 9, 2018, European Patent No. EP 957901 B1 is active in Austria, Belgium, Denmark, Spain, Finland, Monaco, Netherlands, Portugal, and Sweden.

## III.   The Eastwood Trust Obtains Equity in APC by Partial Debt Conversion.

59.     In or around 1997, Plaintiffs and Dr. Demopoulos discussed options to resolve the outstanding debt under the First APC Note, as neither the principal nor accrued interest had been paid since it was delivered over twelve years prior.

60.     Mr. Eastwood and Dr. Demopoulos ultimately agreed to convert the debt on the First APC Note to stock in APC.

61.     Accordingly, APC issued Stock Certificate number four to the Eastwood Trust for 351,650 company shares dated September 24, 1997.

62.     Dr. Demopoulos later memorialized in a letter to Clint Eastwood that the APC "stock certificate covers the original $300,000 you provided in 1985" by way of the First APC Note.

63.     Dr. Demopoulos also emphasized that the APC "stock certificate is only a very tiny representation of what I, and the rest of the world owe you."  Indeed, the Second APC Note and Mr. Eastwood's personal loan to Dr. Demopoulos for $150,000 had yet to be repaid.

## IV.   APC and ThyoGen Pharmaceuticals Dissolve by Proclamation, but Dr. Demopoulos Continues to Conduct Their Business and Issue Stock to the Eastwood Trust.

64.     On December 26, 2001, and absent Plaintiffs' knowledge, the New York State Department of State rendered inactive APC (and Health Maintenance Programs, Inc.) and ThyoGen Pharmaceuticals by way of a Dissolution by Proclamation / Annulment of Authority.

65.     Notwithstanding, and upon information and belief, neither APC nor ThyoGen Pharmaceuticals undertook any wind-up of their affairs or distributed assets to their shareholders

as required by law.

66.     In fact, upon information and belief, the business operations of APC and ThyoGen Pharmaceuticals continued despite their apparent dissolution.

67.     Indeed, APC was still filing applications for – and the USPTO was issuing – the U.S. APC Patents subsequent to its dissolution.

68.     And two years after it seemingly dissolved, Dr. Demopoulos described APC's ongoing business operations to Clint Eastwood by letter dated November 13, 2003, stating that APC "manufactures pharmaceuticals and supplements under long term, binding contracts.  It is also a [d]iscovery company that develops new drugs and combinations."  Dr. Demopoulos also represented to Mr. Eastwood that APC still "owns valuable patents with the most recent one issued July 01, 2003."

69.     Enclosed in Dr. Demopoulos' November 13, 2003 letter to Mr. Eastwood was APC Stock Certificate number thirty to the Eastwood Trust for 648,350 company shares dated November 12, 2003.  This, along with the previously issued stock certificate, brought the total amount of the Eastwood Trust's shares in APC to at least one million.

70.     Despite its similar dissolution by proclamation years prior, Dr. Demopoulos' November 13, 2003 letter to Mr. Eastwood also described the ongoing business operations of ThyoGen Pharmaceuticals as conducting clinical trials with a priority on diabetes, macular degeneration, and strokes, with cancers as a pipeline.  Dr. Demopoulos also represented to Mr. Eastwood that ThyoGen Pharmaceuticals' major assets included investigational new drug standings with the U.S. Food & Drug Administration.

71.     Dr. Demopoulos similarly enclosed in his November 13, 2003 letter to Mr. Eastwood ThyoGen Pharmaceuticals Stock Certificate number two to the Eastwood Trust for

400,000 company shares dated November 12, 2003.

**V.    Dr. Demopoulos Incorporates New Businesses, and Issues Various Stock Certificates to the Eastwood Trust in Return for the Substantial Contributions to Glutathione.**

72.     Years later, on February 9, 2006, the Eastwood Trust continued to support Dr. Demopoulos' glutathione pursuits by extending another loan to Dr. Demopoulos, personally, by way of a promissory note for $125,000.

73.     In or around 2009, Dr. Demopoulos sent correspondence to Plaintiffs explaining that he had apparently reorganized his various businesses to improve and accelerate research.  In his letter, Dr. Demopoulos was also clear in his gratitude to Clint Eastwood and the Eastwood Trust stating, "Thank you for your support through the years.  You acted at just the right times, as in financing our Phase 1 trial [for glutathione].  *It is the foundation of our corporations.*"

74.     Consistent with the representation in his letter, and in 2009 and 2010, Dr. Demopoulos formed The Glutathione Corporation ("Glutathione Corporation") and The Redox & Signaling Pharmaceutical Holdings Corporation ("Redox & Signaling").

75.     In apparent acknowledgement of the substantial contributions to the research, development, and production of glutathione, each of Dr. Demopoulos' new businesses issued the Eastwood Trust stock certificates for 1,291,367 shares as follows:  (i) Glutathione Corporation by Stock Certificate number two, dated December 15, 2011, and (ii) Redox & Signaling by Stock Certificate number five, dated December 15, 2011.

76.     Upon information and belief, various members of Dr. Demopoulos' family, such as Dr. Byron P. Demopoulos and Dr. Richard D. Demopoulos, also received shares as co-tenants in Glutathione Corporation by Stock Certificate number one, dated December 15, 2011.

77.     The Eastwood Trust also received 1,291,367 shares in each of the following entities:  (i) Molecular Defenses, Ltd. by Stock Certificate number two, dated December 15, 2011,

(ii) Cell. Redox Corporation, International by Stock Certificate number two, dated December 15, 2011, and (iii) Global.Cell Signaling Ltd. by Stock Certificate number two, dated December 15, 2011. However, upon information and belief, none of these entities were ever organized or registered to do business in any state.

78.     Despite the formation and apparent operations of Dr. Demopoulos' new companies, such as Glutathione Corporation, APC maintained all right, title, and interest in the U.S. APC Patents. But, all this would soon change with the emergence of Defendant Kevin Davis ("Davis").

**VI.     Dr. Demopoulos' Business is Apparently "Realigned" at Davis' Urging.**

79.     Davis claimed in correspondence that he first started working with Dr. Demopoulos in late 2014.

80.     It was at and around that time, late 2014 and 2015, when Defendants MDC-New York, Molecular Defenses Group Inc., and Thyogen Group Corporation were all incorporated. It was also when Defendants began to assert control and authority over Dr. Demopoulos' glutathione business and tangible and intangible property, such as the U.S. APC Patents and International APC Patents.

81.     According to his letter addressed to the "Glutathione Company Shareholders and Members of the Glutathione Family" dated December 27, 2016 ("December 27 Letter"), which MDC-Nevada Treasurer, Secretary, and director and general and corporate counsel, Gabriel Del Virginia, sent to Plaintiff Howard Bernstein, Davis conveyed pride in having "the honor of working closely with Harry Demopoulos ... and others in the company for more than two years." There, Davis described that his initial, ostensible "role was to rationalize the business, help guide and developed [sic] opportunities, raise capital, and consolidate the shareholders into a more efficient corporate structure."

82.     In his December 27 Letter, Davis also explained his apparent effort to marshal Dr.

Demopoulos' various business entities, and supposedly their shareholders, into a new corporate structure:  "[W]e consulted with our legal and other advisors, and formed Molecular Defenses Corporation as a component of our corporate realignment.  We did so to employ existing and new technologies in prior, related entities, and attract new investors and new scientific and business talent."

83.     Similarly, in an earlier email to Howard Bernstein of June 3, 2016 ("June 3 Email"), Davis wrote that he and outside counsel advised "Dr. Demopoulos that the only way one could move forward with new capital and personnel (including the undersigned) was to do so through a Newco (eventually MDC)..."

84.     Davis' June 3 Email also outlined the business' apparent operations:  "In November 2015, the FDA was briefed on plans to consolidate the current structure, raise capital and move forward to develop both over the counsel and prescription formulations under a new company, MDC."

85.     MDC-Nevada's operations and future plans were also outlined in its Confidential Private Placement Memorandum dated April 2016 ("MDC-Nevada's Confidential PPM"), which Davis attached to his June 3 Email, and by which Davis solicited the Eastwood Trust for additional funding.

86.     Davis had also emailed Plaintiff Howard Bernstein on March 23, 2016, explaining, "this is an interesting time for the companies, on the one hand, my dear friend [Dr. Demopoulos] has had a serious health setback, on the other hand, more serious creditworthy parties are interested in doing significant transactions with us than at any time since I have been involved."  Davis' email also attached, among financial models, a memorandum from Davis addressed to Plaintiffs dated March 22, 2016 ("2016 Memorandum"), as well as a draft business plan that was marked

confidential and dated March 2016 ("Confidential Business Plan").

87.    In his 2016 Memorandum, Davis claimed "Molecular Defenses Corporation and its affiliates, including Cell. Redox Corporation, ThyoGen Group, Redox & Signaling Pharmaceutical Holdings Company, etc [sic] are at a sensitive point, since their founder, Harry Demopoulos who is more like family than an employer has suffered a stroke and his recovery is likely to take some time."

88.    Davis also stated in his 2016 Memorandum that there were "parties who are interested in distributing our glutathione."  Davis even claimed he was invited to meet with Prince Al-Waleed bin Talal bin Abdulaziz in Saudi Arabia in connection with a potential investment. Davis warned, however, that if the company were not successful, it would "engage in an orderly sale."

89.    Davis also emailed Howard Bernstein a memorandum from Davis and MDC-Nevada's Vice President and director Thomas De Shazo, which was marked confidential and dated June 25, 2018 ("2018 Confidential Memorandum").  In their 2018 Confidential Memorandum, Davis and Mr. De Shazo explained that MDC-Nevada (or, alternatively, MDC-New York) is "focused on developing prescription pharmaceuticals, a much more capital-intensive business than that of the Glutathione Corporation."

90.    This apparent "realignment" of Dr. Demopoulos' businesses – in which the Eastwood Trust had and holds substantial ownership interests – and the business operations of MDC-Nevada (or, alternatively, MDC-New York) also implicated the glutathione technology protected by the U.S. APC Patents, which remained in the name of APC during the early stages of the corporate Defendants' existence in 2014 and 2015.  This soon changed, however, with an unexpected and unfortunate turn of events.

**VII.    Dr. Demopoulos Suffers a Stroke, and Defendants Seize the U.S. APC Patents.**

91.    Upon information and belief, and according to Davis' December 27 Letter, Dr. Demopoulos unexpectedly and tragically suffered a massive stroke on or about February 9, 2016.

92.    Upon information and belief, the severity of Dr. Demopoulos' condition required him to stay in a rehabilitative hospital in Rhode Island for several months.  According to Davis' December 27 Letter, Dr. Demopoulos was in a rehabilitation hospital at least through February 2016.  Upon further information and belief, Dr. Demopoulos was still recovering from his stroke in a rehabilitative hospital in March 2016.

93.    It was at or around this unfortunate time, upon information and belief, when Dr. Demopoulos was presented with legal contracts concerning the U.S. APC Patents.

94.    Indeed, as of March 2, 2016, APC and the newly formed Defendant Molecular Defense Holdings, LLC ("MDH") had apparently entered into a Subscription Agreement ("Subscription Agreement").  Notably, MDH was incorporated in Delaware just a week before on February 24, 2016 – the same day that Davis incorporated MDC-Nevada – and just two weeks after Dr. Demopoulos' debilitating stroke.

95.    Pursuant to the Subscription Agreement, APC seemingly transferred all right, title, and interest in the U.S. APC Patents to MDH in exchange for ten membership units in MDH.

96.    Additionally, the Subscription Agreement stated that Dr. Demopoulos received a copy of MDH's Amended and Restated Limited Liability Company Agreement of the Company, and further provided that APC shall be admitted as an Additional Member of MDH.

97.    The signature page of the Subscription Agreement indicated that Dr. Demopoulos, as CEO, signed on APC's behalf.

98.    Dr. Demopoulos' seemingly handwritten signature reads:  "Harry B. Demopoulos By [illegible] Attorney in Fact."

99.     An unidentified "Manager" illegibly signed the Subscription Agreement for MDH.

100.     Considering the severity of his stroke, Dr. Demopoulos' capacity to execute the Subscription Agreement is questionable.

101.     Similarly uncertain is Dr. Demopoulos' authority to execute the Subscription Agreement (including by an unknown "Attorney in Fact") on behalf of APC.

102.     For one, APC was dissolved almost fifteen years prior on December 26, 2001.  By law, APC was required at that time to wind-up its affairs and distribute assets to its shareholders, including the U.S. APC Patents.

103.     In any event, upon information and belief, APC never held a shareholder vote with respect to the assignment of the U.S. APC Patents to MDH by way of the Subscription Agreement.

104.     On February 14, 2017, almost a year after the effective date of the Subscription Agreement, the law firm Wilson Sonsini Goodrich & Rosati filed with the USPTO the initial assignment from 1999 by which Dr. Demopoulos (and his co-inventor) transferred the U.S. APC Patents to APC.  That same day, Wilson Sonsini Goodrich & Rosati also filed with the USPTO, as apparent attorneys for MDH, the Subscription Agreement transferring all right, title, and interest in the U.S. APC Patents to MDH.

105.     The filing of the Subscription Agreement with the USPTO was under cover of a patent assignment cover sheet that lists MDH's business address in New York, New York.[3]

106.     Upon information and belief, it does not appear that APC actually received membership units and admission as a member in MDH in exchange for the transfer of all right, title, and interest in the U.S. APC Patents under the Subscription Agreement.

---

[3] As further indicative of Defendants' unity of interest, ownership, and control, the December 27 Letter from Davis was written on MDC-Nevada (or, alternatively, MDC-New York) letterhead listing MDH's business address in New York City as its own, despite MDC-Nevada (and MDC-New York) maintaining its principal place of business in Elmsford, New York with Glutathione Corporation and Redox & Signaling, next door to APC's Facility.

107.    Moreover, and despite the Subscription Agreement's effective date of March 2, 2016, Defendants repeatedly misrepresented the legal status of the U.S. APC Patents to Plaintiffs.

108.    For example, in his subsequent June 3 Email to Howard Bernstein, Davis stated, "We are in the process of securing all the relevant IP within the compliant investor owned subsidiary."  With respect to five of the six U.S. APC Patents, Davis claimed, "No assignment from Dr. Demopoulos recorded, in the process of negotiating assignment."  As to the single remaining U.S. APC Patent, Davis stated, "Assignment recorded to Antioxidant Pharmaceuticals Corporation."

109.    Additionally, MDC-Nevada's Vice President and director, Thomas De Shazo, represented the following to Howard Bernstein by letter dated January 22, 2018 ("January 22 Letter"):

> Prior to Dr. Demopoulos' death, none of the existing patents had been assigned to The Glutathione Corporation, Cell. Redox Corporation, Global. Cell Signaling, Ltd., Redox and Signaling-Pharmaceutical Holdings, Ltd. (the "Sister Companies").  It was not until after part one of the roll-up (which was outlined to you in 2016 correspondence) did the shareholders in the aforementioned companies gain any beneficial patent ownership interest in any of the six issued glutathione related patents.  *Presently the above 6 [U.S. APC Patents] are now 100% beneficially owned by the pre-2011 shareholders which we trust you will acknowledge as an asset improvement for the shareholders of the Glutathione Corporation and its Sister Companies.*

(emphasis supplied).

110.    Mr. De Shazo also stated in his January 22 Letter, "Importantly, none of the patents listed above are assigned to Molecular Defenses Corporation."

111.    Notwithstanding Defendants' claims, MDC-Nevada and ThyoGen Group (and/or their alter-egos) are asserting ownership, authority, and control over the intellectual property of Dr. Demopoulos' businesses, including the U.S. APC Patents and International APC Patents

(collectively, "APC Patents").

112.    For example, enclosed in Davis' December 27 Letter was a cease and desist letter from MDC-Nevada Treasurer, Secretary, and general and corporate counsel, Gabriel Del Virginia, to a former colleague of Dr. Demopoulos dated October 26, 2016 ("C&D").

113.    The C&D was sent on behalf of "MDC and its affiliates (the 'Company')" and claimed that the "unlawful use and appropriation of the personal and intellectual property of the Company including but not limited to The Glutathione Corp., Molecular Defenses Group, Inc., Antioxidant Pharmaceuticals Corp., infringes upon the Company's patent, copyright and trademark rights."

114.    MDC-Nevada and ThyoGen Group (and/or their alter-egos) are also asserting ownership, authority, and control over other tangible property belonging to Dr. Demopoulos' business.

115.    For example, Davis' June 3 Email and December 27 Letter allege that Dr. Demopoulos' former business colleague repeatedly changed the locks and blocked Davis' access to the facility and corporate records, which upon information and belief, refers to APC's Facility or that of Glutathione Corporation and Redox & Signaling next door.

116.    The C&D also asserts ownership, authority, and control over "any and all property, documents (including electronic), data, and records belonging to the Company, including computerized documents and records, and all tangible and intangible property formerly located at Eight Westchester Plaza, Elmsford, New York" – the principal office of Glutathione Corporation and Redox & Signaling, and next door to APC's Facility.

117.    Davis' December 27 Letter even enclosed a request for proxy to "authorize MDC and its officers to take all action they deem necessary or appropriate to pursue all persons suspected

of converting company and shareholder property, to preserve, protect and defend such property and to revive one or more affiliates that may have been dissolved."  The request for proxy was on behalf of the shareholders of, among other entities, APC, ThyoGen Pharmaceuticals, Glutathione Corporation, and Redox & Signaling.

118.    Defendants' improper assertion of ownership, authority, and control over the APC Patents and all other property belonging to Dr. Demopoulos' business, however, was not enough.

**VIII.    Dr. Demopoulos Succumbs Just Before the USPTO Issues His New Derivative Patent.**

119.    At least as early as 2015, and before his stroke, Dr. Demopoulos was pursuing in the USPTO a new glutathione patent application derived from the technology set forth in the APC Patents.

120.    On February 28, 2015, Dr. Demopoulos' attorney, Steven Hoffberg, emailed Dr. Demopoulos draft claims with respect to this new glutathione patent application.

121.    On June 19, 2015, Dr. Demopoulos filed a provisional patent application with the USPTO, Provisional Serial No. 62/182,229, entitled "Glutathione Formulation and Method of Use" ("Provisional Application").

122.    Dr. Demopoulos was listed as the sole inventor of the Provisional Application.

123.    On February 8, 2016 – which upon information and belief was at or around the time of Dr. Demopoulos' stroke and his attendant efforts to recover in a rehabilitation hospital – Steven Hoffberg sent a letter to Dr. Demopoulos, via email and addressed to APC, confirming the date of filing of the Provisional Application.

124.    In his letter, Mr. Hoffberg advised Dr. Demopoulos to file a non-provisional application for the Provisional Application with the USPTO within twelve months of the date of the filing of the Provisional Application, "[i]f *you* want to obtain U.S. patent protection for *your invention* based on this provision[al] application..." (emphasis supplied).

125.    On June 20, 2016, and following Dr. Demopoulos' stroke, a non-provisional application for the Provisional Application was filed with the USPTO ("Non-Provisional Application").

126.    Unlike the Provisional Application, however, the Non-Provisional Application listed two inventors:  Dr. Demopoulos and Defendant Kevin Davis.

127.    According to MDC-Nevada's Confidential PPM and the Confidential Business Plan, Davis is experienced in investing, building, and managing businesses, and began his career as a corporate lawyer.  Davis has no apparent scientific or technical background and, in particular, he has no apparent background in glutathione formulations or methods of use.

128.    Just days later, on June 29, 2016, Dr. Demopoulos passed away.

129.    Ironically, but unknown to Plaintiffs, the New York State Department of State apparently rendered inactive Glutathione Corporation and Redox & Signaling by way of a Dissolution by Proclamation / Annulment of Authority that same day, on June 29, 2016.

130.    On January 16, 2018, Davis executed an assignment to MDC-Nevada (or, alternatively, MDC-New York) of all his right, title, and interest in the Non-Provisional Application.  Steven Hoffberg filed Davis' assignment with the USPTO.

131.    On February 27, 2018, the USPTO issued the Non-Provisional Application as follows ("U.S. Derivative Patent"):

| Application Date | Issued Patent No. | Title |
|---|---|---|
| 06-20-2016 | 9,901,611 | Glutathione Formulation and Method of Use |

132.    Between June 20, 2016 and November 23, 2016, the following international patent applications (collectively, "International Applications"), listing as alleged inventors both Dr. Demopoulos and Davis, were filed and are currently pending examination:

| Application Date | Pending Application No. | Receiving Office | National Phase No(s). | Title |
|---|---|---|---|---|
| 06-20-2016 | PCT/US/2016/038381 | United States | JP 2018517684 EP 16812627.4 | Glutathione Formulation And Method Of Use |
| 11-23-2016 | PCT/US/2016/063616 | United States | EP 16869281.2 | Pharmaceutical Formulations |

133.    The International Applications are related to the technology set forth in the APC Patents. Notably, International Application No. PCT/US/2016/038381 was filed on the same day as the Non-Provisional Application – which issued into the U.S. Derivative Patent – and derives from the Provisional Application.

134.    The U.S. Derivative Patent and International Applications were derived from the intellectual property of APC, including the existing APC Patents.

135.    Accordingly, and upon information and belief, MDC-Nevada (and/or its alter-egos) now asserts ownership, authority, and control over the APC Patents, U.S. Derivative Patent, and pending International Applications.

## IX.    Plaintiffs Attempt, Unsuccessfully, to Obtain Information from Defendants Concerning the Status of Dr. Demopoulos' Business and Their Attendant Rights.

136.    Beginning in at least early 2016, and even prior to Dr. Demopoulos' stroke, Plaintiffs undertook what turned out to be a two-year – and ultimately futile – attempt to obtain information from Defendants concerning, among other things, the status and operations of Dr. Demopoulos' business and intellectual property, as well as Plaintiffs' attendant rights and ownership interests.

137.    As early as March 22, 2016, Davis sent a letter to Plaintiff Howard Bernstein stating

that Dr. Demopoulos had prepared information, just prior to his stroke, concerning the Eastwood Trust's equity holdings in his various businesses. Davis' letter confirmed that the Eastwood Trust holds 1,291,367 shares in each of Glutathione Corporation and Redox & Signaling.

138. From the parties' earliest introduction in and around early 2016, Defendants repeatedly assured Plaintiffs that their apparent realignment and/or reorganization of Dr. Demopoulos' business would include, and properly account for, the shareholders of Dr. Demopoulos' existing entities.

139. For example, and before requesting working capital for six months' time, Davis wrote to Plaintiffs in his 2016 Memorandum: "This legacy has the potential to be bigger now than before and it is as much your legacy as it is Harry's, you are the one who made [it] financially possible to prove glutathione could be absorbed in high concentrations."

140. Indeed, in the cover email enclosing the 2016 Memorandum, Davis conceded, "Mr. Eastwood is the 2nd largest shareholder in the affiliated group and the man who made it possible to prove glutathione could be absorbed."

141. Davis also represented in his June 3 Email that "[w]e could only focus on the technology and new corporate entities that would include the existing shareholders."

142. Similarly, Davis' December 27 Letter states: "[W]ell before Harry died, we committed to a new course, part of which was to establish Molecular Defenses Corporation and to allow every investor to have an interest in that single entity. ... [O]ur management team is highly confident that your past investments with Harry, still today have a commercial future and financial viability."

143. In his January 22 Letter to Howard Bernstein, MDC-Nevada Vice President and director Thomas De Shazo also represents, "we were 100% committed to preserving and creating

value for all the legacy shareholders including Mr. Eastwood.  …  Preserving shareholder value and commercializing assets and opportunities was the only mission."

144.    But, Mr. De Shazo wrongfully claimed in his January 22 Letter that the U.S. APC Patents "are now 100% beneficially owned by the pre-2011 shareholders which we trust you will acknowledge as an asset improvement for the shareholders of the Glutathione Corporation and its Sister Companies" – even though they were covertly assigned from APC to MDH.

145.    Indeed, and despite Defendants' numerous representations, MDC-Nevada Treasurer, Secretary, and general and corporate counsel, Gabriel Del Virginia, admitted to Plaintiffs' counsel by email on September 11, 2017, that "the "[Eastwood T]rust is not a shareholder of MDC.  If MDC is successful, shareholders of the Glutathione Corporation benefit because the Glutathione Corporation has subscribed for an interest in Molecular Defenses [sic] Holdings LLC which has an interest in MDC."

146.    Notwithstanding, Glutathione Corporation had apparently dissolved more than a year prior on June 29, 2016.  And the Eastwood Trust – Glutathione Corporation's major shareholder – has no record of, and did not vote for, any such purported subscription.

147.    Despite Plaintiffs' repeated attempts since early 2016 to obtain information concerning the status of Dr. Demopoulos' businesses and the Eastwood Trust's resulting interests, Defendants have completely avoided any substantive response to their inquiries.

148.    Nor have Defendants provided Plaintiffs with any sufficient documentation despite their insistence that the Eastwood Trust enter into a nondisclosure agreement to obtain information concerning Dr. Demopoulos' business and APC Patents – information that Plaintiffs are, in any event, entitled to by law.

149.    On February 8, 2018, Thomas De Shazo went so far as to warn Plaintiffs' counsel

by email that the history and uncertainty of Dr. Demopoulos' business is somehow unfavorable to its legacy shareholders. Mr. De Shazo threatened, "MDC or its technologies will go no-where without the current team" and "unless there is a resolution little will progress within MDC."

150.     Thereafter, Defendants' stonewalling continued. By email dated April 27, 2018, Davis acknowledged the Eastwood Trust's interests in Glutathione Corporation and Redox & Signaling, and even admitted that he was not an officer or director and has no equity interest in those companies. Despite these concessions, Davis still refused to provide Plaintiffs with the books and records of Glutathione Corporation and Redox & Signaling without substantial redactions that rendered the material illegible and useless.

151.     Most recently in their 2018 Confidential Memorandum, Davis and Thomas De Shazo again acknowledged the Eastwood Trust's interests in Glutathione Corporation and Redox & Signaling, and conceded that they are not officers or directors of those companies and never operated or managed them. Yet, Davis and Mr. De Shazo again refused to provide Plaintiffs with any of the requested information.

152.     Davis and Thomas De Shazo also asserted in their 2018 Confidential Memorandum that the Eastwood Trust is not a shareholder of MDC-Nevada (and/or MDC-New York), although equity was apparently issued to other investors of Dr. Demopoulos' businesses. In a final rebuke, Davis and Mr. De Shazo acknowledged Plaintiffs' concerns as to the status of Dr. Demopoulos' businesses and the Eastwood Trust's resulting interests, but pithily stated, "we are not obligated to spend our own money to facilitate such."

153.     Defendants' wrongful taking of the APC Patents, U.S. Derivative Patent, pending International Applications, and other assets belonging to Dr. Demopoulos' business, their misrepresentations and concealment of salient facts, and threat to close the doors of MDC-Nevada

and/or MDC-New York – presumably while wrongfully maintaining or otherwise transferring

away the APC Patents, U.S. Derivative Patent, International Applications, and other assets – has

left Plaintiffs with no alternative but to bring this litigation on their own behalf and for the other

shareholders of Dr. Demopoulos' relevant entities.

**COUNT ONE – DECLARATORY RELIEF**
**SOLE INVENTORSHIP OF U.S. DERIVATIVE PATENT**
**AND INTERNATIONAL APPLICATION NO. PCT/US/2016/038381**
**(Against Kevin Davis and MDC-Nevada, and Alternatively, MDC-New York)**

154.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully

set forth herein.

155.    Plaintiffs have a legally protected interest in the U.S. Derivative Patent and

International Application No. PCT/US/2016/038381.

156.    Dr. Demopoulos was listed as the sole inventor of the Provisional Application upon

its filing on June 19, 2015.

157.    Claiming the benefit of the Provisional Application and no other applications, on

June 20, 2016, the Non-Provisional Application was filed with the USPTO and eventually issued

as the U.S. Derivative Patent.  On the same day, June 20, 2016, and also claiming the benefit of

the Provisional Application and no other applications, International Application No.

PCT/US/2016/038381 was filed with the USPTO.  The Non-Provisional Application and

International Application No. PCT/US/2016/038381 each listed both Dr. Demopoulos and

Defendant Kevin Davis as inventors.

158.    Upon information and belief, Defendant Kevin Davis is not an inventor of the

inventions claimed in the U.S. Derivative Patent or International Application No.

PCT/US/2016/038381.  Significant portions of the Non-Provisional Application are copied

directly from the Provisional Application and relate to the same or similar technology as is

described in the APC Patents.  The remaining portions of the Non-Provisional Application include additional technical explanations and examples of glutathione treatment, formulations, and methods regarding the same.  International Application No. PCT/US/2016/038381 describes substantially similar subject matter as the Non-Provisional Application.  Accordingly, Dr. Demopoulos is the sole inventor of the U.S. Derivative Patent and International Application No. PCT/US/2016/038381.

159.    There is an actual and justiciable controversy between Plaintiffs and Defendants as to whether Defendant Kevin Davis is an inventor of the inventions claimed in the U.S. Derivative Patent and International Application No. PCT/US/2016/038381.

160.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiffs and Doe Plaintiffs, the other shareholders of APC, are entitled to a judgment declaring that Dr. Demopoulos is the sole inventor of the inventions claimed in the U.S. Derivative Patent and International Application No. PCT/US/2016/038381, which belong to Plaintiffs and Doe Plaintiffs, the other shareholders of APC.

**COUNT TWO – DECLARATORY RELIEF**
**U.S. DERIVATIVE PATENT**
**AND INTERNATIONAL APPLICATION NO. PCT/US/2016/038381**
**DERIVE FROM PROVISIONAL APPLICATION**
**(Against Kevin Davis and MDC-Nevada, and Alternatively, MDC-New York)**

161.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

162.    Plaintiffs have a legally protected interest in the U.S. Derivative Patent and International Application No. PCT/US/2016/038381.

163.    Each of the U.S. Derivative Patent and International Application No. PCT/US/2016/038381 derives from the intellectual property of APC, including the disclosure of the Provisional Application.  Pursuant to 35 U.S.C. § 119, the Non-Provisional Application (which

issued into the U.S. Derivative Patent) and International Application No. PCT/US/2016/038381 were filed within the 12-month pendency period from the date that the Provisional Application was filed, and the U.S. Derivative Patent and International Application No. PCT/US/2016/038381 each properly reference the Provisional Application.

164.    There is an actual and justiciable controversy between Plaintiffs and Defendants as to whether the U.S. Derivative Patent and International Application No. PCT/US/2016/038381 derive from the Provisional Application.

165.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiffs and Doe Plaintiffs, the other shareholders of APC, are entitled to a judgment declaring that each of the U.S. Derivative Patent and International Application No. PCT/US/2016/038381 derives from the Provisional Application.

<u>COUNT THREE – CORRECTION OF INVENTORSHIP</u>
**U.S. DERIVATIVE PATENT**
**(Against Kevin Davis and MDC-Nevada, and Alternatively, MDC-New York)**

166.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

167.    Plaintiffs have a legally protected interest in the U.S. Derivative Patent.

168.    As discussed above, Defendants Kevin Davis and MDC-Nevada (or, alternatively, MDC-New York) have filed patent applications and/or obtained patents on inventions for which Dr. Demopoulos is the sole inventor because Dr. Demopoulos solely contributed to the claimed invention that is significant in quality, when measured against the dimension of the full invention.

169.    Because Dr. Demopoulos is rightfully the sole inventor of the U.S. Derivative Patent, and because Defendant Kevin Davis is not an inventor of the Provisional Application from which the U.S. Derivative Patent derives, this Court should issue an Order pursuant to 35 U.S.C. § 256 directing the Commissioner of Patents to remove Defendant Kevin Davis as an inventor of the U.S. Derivative Patent.

**COUNT FOUR – CORRECTION OF INVENTORSHIP**
**INTERNATIONAL APPLICATION NO. PCT/US/2016/038381**
**(Against Kevin Davis and MDC-Nevada, and Alternatively, MDC-New York)**

170.     Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

171.     Plaintiffs have a legally protected interest in the pending International Application No. PCT/US/2016/038381.

172.     As discussed above, Defendants Kevin Davis and MDC-Nevada (or, alternatively, MDC-New York) have filed patent applications and/or obtained patents on inventions for which Dr. Demopoulos is the sole inventor because Dr. Demopoulos solely contributed to the claimed invention that is significant in quality, when measured against the dimension of the full invention.

173.     Because Dr. Demopoulos is rightfully the sole inventor of International Application No. PCT/US/2016/038381, and because Defendant Kevin Davis is not an inventor of the Provisional Application from which International Application No. PCT/US/2016/038381 derives, this Court should issue an Order directing the Commissioner of Patents to request that the International Bureau remove Defendant Kevin Davis as an inventor of International Application No. PCT/US/2016/038381, pursuant to PCT Rule 92bis.

**COUNT FIVE – DECLARATORY RELIEF**
**PATENT OWNERSHIP OF APC PATENTS, U.S. DERIVATIVE PATENT,**
**AND INTERNATIONAL APPLICATIONS**
**(Against MDH and MDC-Nevada, and Alternatively, MDC-New York)**

174.     Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

175.     Plaintiffs have a legally protected interest in the APC Patents, U.S. Derivative Patent, and pending International Applications.

176.     The U.S. APC Patents were wrongfully and/or invalidly assigned from APC to

MDH.  Those assignments are null and void.

177.    The U.S. Derivative Patent and the International Applications were wrongfully and/or invalidly assigned to MDC-Nevada (or, alternatively, MDC-New York).    Those assignments are null and void.

178.    Defendants MDH and MDC-Nevada (or, alternatively, MDC-New York) claim ownership, authority, control, rights, title, and/or interest in the APC Patents, U.S. Derivative Patent, and International Applications, and are utilizing them absent Plaintiffs' consent and to their injury.

179.    Defendants are not owners of the APC Patents, U.S. Derivative Patent, and International Applications, the intellectual property associated with those patents, or their subject matter.

180.    There is an actual and justiciable controversy between Plaintiffs and Defendants as to the ownership of the APC Patents, U.S. Derivative Patent, and International Applications, which prevents Plaintiffs from exercising and enjoying any rights and benefits therein.

181.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiffs are entitled to a judgment declaring that (i) Defendants have no ownership, authority, control, rights, title, and/or interest in the APC Patents, U.S. Derivative Patent, and International Applications, and may exercise no rights in, or utilize in any way, the APC Patents, U.S. Derivative Patent, and International Applications, (ii) Plaintiffs and Doe Plaintiffs, the other shareholders of APC, are the sole owners of the APC Patents, U.S. Derivative Patent, and International Applications, and (iii) Plaintiffs and Doe Plaintiffs, the other shareholders of APC, are entitled to all royalties, proceeds, and benefits wrongfully earned, realized, and/or obtained by Defendants in any way arising from the APC Patents, U.S. Derivative Patent, and International Applications and any intellectual property

related thereto.

### COUNT SIX – CONVERSION
**(Against All Defendants)**

182.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

183.    Defendants have and are exercising unauthorized assumption, ownership, and/or dominion over the tangible and/or intangible property of APC, including without limitation the APC Patents, U.S. Derivative Patent, pending International Applications, and any intellectual property related thereto, as well as any and all rights, royalties, proceeds, and/or benefits arising therefrom.

184.    Upon information and belief, Defendants have and are exercising unauthorized assumption, ownership, and/or dominion over the tangible and intangible property of ThyoGen Pharmaceuticals, Glutathione Corporation, and Redox & Signaling, including without limitation money and funds, company shares, books and records, machinery, equipment, furniture, and/or fixtures.

185.    Defendants have and are exercising unauthorized assumption, ownership, and/or dominion over such property to the exclusion of Plaintiffs and Doe Plaintiffs and in interference with their legal title and superior right of possession.

186.    Defendants committed each act of conversion with reckless disregard to the rights of Plaintiffs and Doe Plaintiffs.

187.    Upon information and belief, Defendants have and continue to hold such property wrongfully diverted.

188.    As a direct and proximate result of Defendants' conversion, Plaintiffs and Doe Plaintiffs are entitled to damages in an amount to be determined at trial, with interest thereon, in

addition to special and punitive damages.

189.    Plaintiffs and Doe Plaintiffs are also entitled to an accounting of all assets, funds, and property converted by Defendants, and a constructive trust over all assets owned and/or controlled by Defendants that are the product of the improperly diverted assets, funds, and property of APC, ThyoGen Pharmaceuticals, Glutathione Corporation, and Redox & Signaling.

## COUNT SEVEN – UNJUST ENRICHMENT
### (Against All Defendants)

190.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

191.    Defendants were wrongfully enriched by the use and enjoyment of the APC Patents, U.S. Derivative Patent, pending International Applications, and any intellectual property related thereto, and any and all rights, royalties, proceeds, and/or benefits arising therefrom, as well as any and all tangible and/or intangible property of APC, ThyoGen Pharmaceuticals, Glutathione Corporation, and Redox & Signaling.

192.    It would be unequitable and improper for Defendants to retain any direct and/or indirect proceeds and/or benefits realized as a result.

193.    Were Defendants entitled to do so, it would constitute unjust enrichment.

194.    Such proceeds, benefits, and/or assets properly belong, and should be awarded with interest thereon, to Plaintiffs and Doe Plaintiffs.

## COUNT EIGHT – CONSTRUCTIVE TRUST
### APC PATENTS, U.S. DERIVATIVE PATENT, INTERNATIONAL APPLICATIONS, AND ANY INTELLECTUAL PROPERTY RELATED THERETO
### (Against All Defendants)

195.    Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein.

196.     Defendants had and/or have a confidential or fiduciary relationship with Dr. Harry B. Demopoulos, APC, and Plaintiffs, and did so when the APC Patents, U.S. Derivative Patent, pending International Applications, and any intellectual property related thereto were wrongfully and/or invalidly assigned and/or transferred to Defendants.

197.     The APC Patents, U.S. Derivative Patent, International Applications, and any intellectual property related thereto were assigned and/or transferred to Defendants in reliance on their promises to transfer membership units in MDH to APC and admit it as a member of MDH, as well as Defendants' promises to include, and properly account for, the shareholders of Dr. Demopoulos' existing entities.

198.     Defendants' exercise of ownership, authority, control, rights, title, and/or interest in the APC Patents, U.S. Derivative Patent, International Applications, and any intellectual property related thereto have unjustly enriched them at the expense and detriment of Plaintiffs and Doe Plaintiffs, the other shareholders of APC.

199.     As a result, a constructive trust should be imposed over the APC Patents, U.S. Derivative Patent, International Applications, and any intellectual property related thereto on behalf of Plaintiffs and Doe Plaintiffs, the other shareholders of APC.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests the Court order and adjudge the following relief in their favor and against Defendants:

A.     On Count One, judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that Dr. Demopoulos is the sole inventor of the inventions claimed in the U.S. Derivative Patent and International Application No. PCT/US/2016/038381, which belong to Plaintiffs and Doe Plaintiffs, the other shareholders of APC;

B.     On Count Two, judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that

the U.S. Derivative Patent and International Application No. PCT/US/2016/038381 are derived from the intellectual property of APC, including that disclosed in the existing APC Patents and the Provisional Application, the ownership, authority, control, rights, title, and/or interest to which belong to Plaintiffs and Doe Plaintiffs, the other shareholders of APC;

C.     On Count Three, an Order directing the Commissioner of Patents to remove Defendant Kevin Davis as inventor of the U.S. Derivative Patent;

D.     On Count Four, an Order directing the Commissioner of Patents to request that the International Bureau remove Defendant Kevin Davis as inventor of the International Application No. PCT/US/2016/038381;

E.     On Count Five, judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that (i) Defendants have no ownership, authority, control, rights, title, and/or interest in the APC Patents, U.S. Derivative Patent, and International Applications, and may exercise no rights in, or utilize in any way, the APC Patents, U.S. Derivative Patent, and International Applications, (ii) Plaintiffs and Doe Plaintiffs, the other shareholders of APC, are the sole owners of the APC Patents, U.S. Derivative Patent, and International Applications, and (iii) Plaintiffs and Doe Plaintiffs, the other shareholders of APC, are entitled to all royalties, proceeds, and benefits wrongfully earned, realized, and/or obtained by Defendants in any way arising from the APC Patents, U.S. Derivative Patent, and International Applications and any intellectual property related thereto;

F.     On Count Six, damages in an amount to be determined at trial, with interest thereon, in addition to special and punitive damages, an accounting, and a constructive trust;

G.     On Count Seven, all direct and indirect proceeds, benefits, and/or assets with interest thereon;

H.      On Count Eight, a constructive trust over the APC Patents, U.S. Derivative Patent, International Applications, and any intellectual property related thereto;

I.      An award of attorneys' fees, costs, and disbursements;

J.      An order declaring this case to be an exceptional case pursuant to 35 U.S.C. § 285 and ordering Defendants to pay the costs of this action (including all disbursements) and attorneys' fees; and

K.      Such other and further relief as the Court deems just, proper, and equitable.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  New York, New York
        July 24, 2018                        **ROBINS KAPLAN LLP**

                                        By:  <u>s/ Paul V. LiCalsi</u>

                                        Paul V. LiCalsi
                                        Bryan J. Vogel
                                        Michael A. Kolcun
                                        Carly A. Kessler
                                        399 Park Avenue, Suite 3600
                                        New York, New York 10022
                                        (212) 980-7400
                                        PLiCalsi@RobinsKaplan.com
                                        BVogel@RobinsKaplan.com
                                        MKolcun@RobinsKaplan.com
                                        CKessler@RobinsKaplan.com
                                        *Attorneys for Plaintiffs*