USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/1/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLINTON EASTWOOD et al.,

              Plaintiffs,

- against -

MOLECULAR DEFENSES CORP. et al.,

              Defendants.

18cv6652 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

    Plaintiffs Clinton Eastwood and Howard Bernstein, as Trustees of the 1988 Clinton Eastwood Trust ("Eastwood Trust"), bring this Complaint against defendants Molecular Defenses Corporation (Nevada) ("MDC Nevada"); Molecular Defenses Corporation (New York) ("MDC New York"); Molecular Defense Holdings, LLC ("MDH"); Molecular Defenses Group Inc.; ThyoGen Group Corporation; and Kevin Davis, the President and Chief Executive Officer of MDC Nevada and ThyoGen Group.

    The plaintiffs allege federal patent claims for priority and correction of inventorship, and state law claims for conversion, unjust enrichment, and constructive trust. The defendants move to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and (6). For the reasons explained below, the defendants' motion to dismiss based on Rule 12(b)(1) is **granted**.

1

**I.**

In defending against a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. See J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004). The Court does not, however, draw all reasonable inferences in the plaintiff's favor. Id.; see also Graubart v. Jazz Images, Inc., No. 02cv4645, 2006 WL 1140724, at *2 (S.D.N.Y. Apr. 27, 2006). Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek, 600 F.3d 171, 175 (2d Cir. 2010); APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by the body of decisional law that has developed under Rule 56 of the Federal Rules of Civil Procedure. Kamen, 791 F.2d at 1011.

When presented with a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and a motion to dismiss

on other grounds, the first issue is whether the Court has the subject matter jurisdiction necessary to consider the merits of the action. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

**II.**

The following facts are accepted for the purposes of the pending motion.

In the mid-1980s plaintiff Clint Eastwood began providing money to support the work of Dr. Harry B. Demopoulos. (Compl. ¶¶ 3, 47.) Dr. Demopoulos was a medical researcher who was exploring glutathione, an antioxidant used to treat diabetes and other serious diseases. (Id. ¶ 36.) Dr. Demopoulos operated various businesses devoted to the research of glutathione and to the development of glutathione into pharmaceutical commerce. (Id.) One of those businesses, founded on July 28, 1981, was Antioxidant Pharmaceuticals Corporation ("APC"). (Id. ¶ 46.) APC was formed to research and develop antioxidant nutrient supplements for the over-the-counter consumer healthcare market. (Id.)

From 1985 to 1996, Eastwood made large monetary loans, both to Dr. Demopoulos and to APC, to support Dr. Demopoulos's cause. In 1985, Eastwood loaned APC $300,000. (Id. ¶ 48.) In 1994, Eastwood gave APC $43,440. (Id. ¶ 51.) And in 1996, Eastwood loaned Dr. Demopoulos $150,000. (Id. ¶ 52.) Dr. Demopoulos

3

used the money from Eastwood "in pursuit of glutathione." (Id. ¶ 53.)

Dr. Demopoulos's work proved fruitful, and from 1997 to 2002 Dr. Demopoulos filed applications for six United States patents relating to glutathione (the "U.S. APC Patents"). (Id. ¶ 54.)[1] On December 8, 1999, Dr. Demopoulos executed an assignment to APC of all rights, title, and interest in the U.S. APC Patents, which were still applications at that time. (Id. ¶ 55.) Between December 12, 2000, and May 24, 2005, the U.S. APC Patents issued from the United States Patent and Trademark Office ("USPTO"). (Id. ¶ 56.)[2]

In 1997, Dr. Demopoulos, who had not yet repaid Eastwood for his investments, agreed with Eastwood to convert the debt he owed Eastwood into stock in APC. (Id. ¶¶ 59-60.) On September 24, 1997, APC issued 351,650 company shares to the Eastwood Trust as repayment for the initial $300,000 loan Eastwood provided in 1985. (Id. ¶¶ 61-62.)

On December 26, 2001, the New York State Department of State issued a dissolution by proclamation against APC, which

---

[1] Those patents are: 6,159,500; 6,350,467; 6,204,248; 6,423,687; 6,896,899; and 6,586,404. (Compl. ¶ 54.)

[2] In December 1997, Dr. Demopoulos filed two applications for international patents relating to glutathione (the "International APC Patents") (application numbers: CA 2276183 C and EP 0957901 B1). (Compl. ¶ 57.) The International APC Patents issued in 2009. (Id. ¶ 58.)

4

rendered the company "inactive." (Id. ¶ 64.) The Eastwood Trust owned over 300,000 shares of APC, but the plaintiffs allege they were unaware that APC was rendered inactive. (Id.) Despite being defunct, business operations of APC continued. (Id. ¶ 66). Indeed, APC was still filing applications for patents after it was dissolved. (Id. ¶ 67.)

In November 2003, the technically defunct APC issued another stock certificate to the Eastwood Trust for 648,350 company shares. (Id. ¶ 69.) Around the same time, another of Dr. Demopoulos's companies -- ThyoGen Pharmaceuticals -- gave 400,000 shares to the Eastwood trust. (Id. ¶ 71.) ThyoGen, like APC, had been dissolved by the New York State Department of State on December 26, 2001, without the plaintiffs' knowledge. (Id. ¶ 64.)

On February 9, 2006, the Eastwood Trust loaned $125,000 to Dr. Demopoulos "to support Dr. Dempoulos'[s] glutathione pursuits." (Id. ¶ 72.)

In addition to APC, Dr. Demopoulos had a number of businesses that operated in the medical products space. In December 2011, two of Dr. Demopoulos's businesses, The Glutathione Corporation and the Redox & Signaling Pharmaceutical Holdings Corporation, issued over a million shares in their respective companies to the Eastwood Trust. (Id. ¶ 75.)

5

In late 2014, defendant Kevin Davis began working with Dr. Demopoulos. (Id. ¶ 79.) The plaintiffs allege that Davis was brought on to consolidate Dr. Demopoulos's businesses. (Id. ¶¶ 81-82.) Davis sought to create a "more efficient corporate structure" by organizing Dr. Demopoulos's businesses under one corporate umbrella. (Id.) MDC New York was created around that time to help facilitate that goal. (Id. ¶¶ 5, 81-82.) The plaintiffs claim that this was when the defendants began to assert "control and authority over Dr. Demopoulos'[s] glutathione business and tangible and intangible property, such as the U.S. APC Patents and International APC Patents." (Id. ¶ 80.)

On February 9, 2016, Dr. Demopoulos suffered a "massive stroke." (Id. ¶ 91.)

The U.S. APC Patents remained in the name of APC -- despite the company's being defunct -- until 2016. (Id. ¶¶ 90, 94.) In late February 2016, defendant MDH was formed. (Id. ¶ 94.) In February or March 2016, MDH and APC entered into a subscription agreement whereby APC transferred all right, title, and interest in the U.S. APC Patents to MDH in exchange for ten membership units in MDH. (Id. ¶¶ 94-95.) Dr. Demopoulos, as CEO of APC,

6

signed the subscription agreement on behalf of APC. (Id. ¶ 97.)[3] An unidentified manager signed on behalf of MDH. (Id. ¶ 99.) APC did not hold a shareholder vote to consent to or ratify the assignment. (Id. ¶ 103.) The plaintiffs also allege that APC did not actually receive membership units from MDH. (Id. ¶ 106.)

On June 20, 2016, Dr. Demopoulos and Davis filed a nonprovisional patent application with the USPTO for patent number 9,901,611 ("the '611 patent"). (Id. ¶¶ 125-26.) Dr. Demopoulos had previously filed a provisional application for this patent on June 19, 2015.[4] (Id. ¶ 121.) Dr. Demopoulos was listed as the sole inventor on the provisional application. (Id. ¶ 122.) However, the nonprovisional application listed two inventors, Dr. Demopoulos and Davis, and "include[d] additional technical explanations and examples of glutathione treatment, formulations, and methods." (Id. ¶¶ 126, 158.) The complaint does not state whether the provisional application was assigned to any person or company, but the nonprovisional application was assigned to MDC Nevada or MDC New York by Davis. (Id. ¶ 130.) The plaintiffs assert that Dr. Demopoulos never assigned away

---

[3] The plaintiffs allege that Dr. Demopoulos's full signature on the subscription agreement read, "Harry B. Demopoulos By [illegible] Attorney in Fact." (Compl. ¶ 98.)

[4] The application was assigned Provisional Serial No. 62/182,229 and entitled "Glutathione Formulation and Method of Use." (Compl. ¶ 121.)

7

his interest in the '611 patent. (Pls.' Opp'n at 3.) However, the '611 patent lists MDC New York as the assignee of the patent. (Defs.' Ex. 1.) And the Inventor Substitute Statement for Dr. Demopoulos confirms that Dr. Demopoulos was obligated to assign the '611 patent to MDC. (Defs.' Reply Ex. E.) The plaintiffs do not allege that either the provisional application or the nonprovisional application of the '611 patent were assigned to APC or the Eastwood Trust.

Between June 20, 2016, and November 23, 2016, Dr. Demopoulos and Davis filed applications for two international patents[5] that are currently pending examination. (Id. ¶ 132.) Both Dr. Demopoulos and Davis were listed as inventors on these applications. (Id.) The plaintiffs claim that both of the international applications are related to the technology set forth in the APC Patents and that one of the international applications -- number PCT/US/2016/038381 ("the '381 application") -- derived from the provisional application for the '611 patent, which listed Dr. Demopoulos as the sole inventor. (Id. ¶¶ 133-34.)

On February 14, 2017, the defendants' lawyers filed with the USPTO the assignment papers by which Dr. Demopoulos and his co-inventor transferred the U.S. APC Patents to APC in 1999.

---

[5] The applications have pending application numbers PCT/US/2016/038381 and PCT/US/2016/063616. (Compl. ¶ 132.)

8

(Id. ¶ 104.) That same day, the attorneys filed with the USPTO the subscription agreement between APC and MDH, that transferred the right, title, and interest in the U.S. APC Patents from APC to MDH. (Id.) The '611 patent and the '381 application were not a part of this transfer. (Id. ¶¶ 54, 104.)

## III.

The plaintiffs assert eight claims, four federal patent claims and four state law claims. All of the plaintiffs' federal patent claims center on a single contention: that the defendants nefariously included Davis's name as an inventor on the '611 patent and the '381 application in order to swindle the patents from Dr. Demopoulos and APC's shareholders. The plaintiffs argue that Davis was able to transfer ownership of the '611 patent and the '381 application to MDC Nevada or MDC New York only because he was wrongfully listed as an inventor. The plaintiffs claim that if Davis had not been included as an inventor and, thus, unable to transfer the '611 patent and the '381 application to MDC Nevada or MDC New York, the '611 patent and the '381 application would belong to Dr. Demopoulos and, although unclear how, the APC shareholders. The plaintiffs seek correction of inventorship to strike Davis's name from the '611 patent and the '381 application as well as a declaration that the '611 patent and the '381 application derive from Dr.

Demopoulos's provisional application for the '611 patent, which did not include Davis's name as an inventor.

The plaintiffs' state law claims are for a declaration of ownership of the '681 patent, the '381 application, and the U.S. and International APC Patents,[6] as well as for conversion, unjust enrichment, and constructive trust. In essence, the plaintiffs claim that the defendants have wrongfully deprived them of their rights to that intellectual property.

**A.**

The defendants assert that the plaintiffs' federal patent claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because the plaintiffs do not have standing to bring those claims and that the state law claims should be dismissed because there is no supplemental jurisdiction absent the federal claims.

"Once a patent issues . . . 35 U.S.C. § 256 provides a private right of action to challenge inventorship, and such a challenge arises under [28 U.S.C. ]§ 1338(a)." HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., 600 F.3d 1347, 1354 (Fed. Cir.

---

[6] The plaintiffs' fifth claim requests a declaration that APC is the sole owner of the '611 patent, '381 application, the U.S. APC Patents that were transferred to MDH in the subscription agreement, and the International APC Patents. Because this is a claim of ownership, it is claim based on state law. See StoneEagle Servs., Inc. v. Gillman, 746 F.3d 1059, 1063 (Fed. Cir. 2014) ("[O]wnership is typically a question of state law."); see also id. at 1062 ("[T]he Declaratory Judgment Act is not an independent basis for subject matter jurisdiction.").

10

2010). However, "a plaintiff seeking correction of inventorship under § 256 can pursue that claim in federal court only if the requirements for constitutional standing -- namely injury, causation, and redressability -- are satisfied." Larson v. Correct Craft, Inc., 569 F.3d 1319, 1326 (Fed. Cir. 2009). A plaintiff challenging inventorship meets the Article III burden by showing an "ownership interest" in the patent, id. at 1327, a "concrete financial interest" in the patent, Chou v. Univ. of Chi., 254 F.3d 1347, 1359 (Fed. Cir. 2001), or a "concrete and particularized reputational injury" arising from the omission as a named inventor on the patent, Shukh v. Seagate Tech., LLC, 803 F.3d 659, 663 (Fed. Cir. 2015). The plaintiffs argue that they have standing to assert their federal priority and inventorship claims because the Eastwood Trust has an ownership or financial interest in the '611 patent and the '381 application and because the Eastwood Trust is a creditor of Dr. Demopoulos. None of the plaintiffs' arguments are persuasive.

1.

The plaintiffs argue that standing is satisfied because the Eastwood Trust owns the '611 patent and the '381 application. Their argument is not supported by the pleadings. It is plain that none of the plaintiffs -- including the Eastwood Trust -- own the '611 patent or the '381 application. The plaintiffs do not allege in the complaint that the Eastwood Trust was ever

11

assigned the rights to the '611 patent or the '381 application. Rather, according to the complaint, Davis assigned the rights of the '611 patent to MDC Nevada (or, alternatively, MDC New York), (Compl. ¶ 130), and MDC Nevada (and/or its alter egos) asserts ownership of the '381 application, (id. ¶ 135). Thus, the plaintiffs have not alleged ownership of the '611 patent or the '381 application.

**2.**

The plaintiffs alternatively argue that standing is satisfied because the Eastwood Trust has a financial interest in the '611 patent and the '381 application as a shareholder of various of Dr. Demopoulos's companies. The plaintiffs do not allege that they own shares in MDC Nevada (or MDC New York) -- the entity the plaintiffs claim own the '611 patent and the '381 application. Rather, the plaintiffs assert that the Eastwood Trust owns shares in companies, such as APC, that own an interest in MDH, and that MDH has an interest in MDC Nevada and MDC New York.

The plaintiffs argue that this connection to the '611 patent and the '381 application as shareholders twice removed is sufficient to assert standing under Chou v. University of Chicago, 254 F.3d 1347 (Fed. Cir. 2001). But the plaintiffs' purported indirect interest in the '611 patent and the '381 application is nothing like the plaintiff's interest in Chou.

12

In Chou, the plaintiff was a graduate student and postdoctoral research assistant at the University of Chicago. Id. at 1353. Under university policy, inventors were required to assign their interest in any inventions to the university. Id. However, inventors listed on a patent would be credited with 25 percent of the gross royalties and up-front payments from licensing of the patent, as well as 25 percent of the stock of new companies formed based on the invention. Id. The plaintiff alleged that she was not listed as an inventor on a patent that she helped develop and sued under § 256 for correction of inventorship. Id. After the district court dismissed the case for lack of standing, the Federal Circuit Court of Appeals reversed. Id. at 1353. The appellate court held that the plaintiff's entitlement to proceeds from licensing and stock were a "concrete financial interest in the patent, albeit an interest less than ownership." Id. at 1359. Although the plaintiff did not have an expectation of ownership in the patent -- because she was required to assign her rights to the university -- she had still shown that she would lose her entitlement to licensing fees and stock if she was not listed as an inventor. Id. at 1358. Therefore, the court held that she had alleged standing. Id.

The plaintiffs here have not alleged any similar "concrete financial interest" in the '611 patent or the '381 application. None of the plaintiffs allege that they were inventors of the

13

'611 patent or the '381 application. The only financial interest in the '611 patent and the '381 application the plaintiffs allege is that the Eastwood Trust is a shareholder of companies that have an ownership interest in MDH, which has an ownership interest in the MDC entity that owns the '611 patent and the '381 application. That is not a "concrete financial interest" sufficient to confer standing. See Hall v. Cargill, Inc., 02cv156, at 5 (S.D. Ga. May 24, 2005) (holding that a shareholder of a company that owned the patents at issue lacked standing to sue under § 256 because "[t]he rise and fall of the value of . . . stock is simply too attenuated to establish a concrete financial interest in the . . . patents to confer standing").[7]

### 3.

The plaintiffs also summarily argue that they have standing because the Eastwood Trust has an interest in the '611 patent and the '381 application as a creditor of Dr. Demopoulos. The plaintiffs do not provide any reason why they should be allowed to assert claims for the '611 patent and the '381 application

---

[7] The plaintiffs allege that Davis assigned his rights to the '611 patent to an MDC entity but that Dr. Demopoulos did not. However, the '611 patent lists MDC New York as the assignee of the patent. (Defs.' Ex. 1.) And the Inventor Substitute Statement for Dr. Demopoulos confirms that Dr. Demopoulos was obligated to assign the '611 patent to MDC. (Defs.' Reply Ex. E.) Moreover, even if Dr. Demopoulos had not assigned the rights to the '611 patent to MDC and Davis's name were removed as an inventor, the plaintiffs have not plausibly pleaded that they would be entitled to the '611 patent or the '381 application.

14

merely because the Eastwood Trust is a creditor of Dr. Demopoulos. The plaintiffs do not allege that they hold a security interest or that they can claim any right in the '611 patent or the '381 international application based on loans to Dr. Demopoulos. In short, the plaintiffs have failed to allege a chain of title that would entitle them to any ownership or financial interest in the '611 patent or the '381 application.

*   *   *

At bottom, the plaintiffs fail to allege that the Eastwood Trust, or any of the other plaintiffs, have or ever had any interest in the '611 patent or the '381 application. Rather, the plaintiffs allege that Davis wrongfully caused the conversion of the '611 patent and the '381 application. But that claim requires them to succeed on state law claims before bringing federal inventorship or priority claims. When a patent claimant depends on a state law remedy to achieve a sufficient claim to the patent, the claimant lacks standing to assert the patent claim. First Data Corp. v. Inselberg, 870 F.3d 1367, 1375 (Fed. Cir. 2017) (affirming dismissal of a complaint and counterclaims in a related action for lack of jurisdiction where the patent claims were premised on title to the patents and would require the court to find assignment of the patents was invalid under state law).

15

Therefore, because the plaintiffs do not have standing to bring their inventorship or priority claims, counts one to four, those claims are **dismissed without prejudice**.

**B.**

Because the plaintiffs' do not have standing to assert their federal claims, the plaintiffs' state law claims must also be dismissed. "[I]f the jurisdiction-conferring patent claim is dismissed for lack of standing, the district court cannot exercise supplemental jurisdiction over surviving state-law claims because there was never an Article III case or controversy." Larson, 569 F.3d at 1325-26. The Court has dismissed the plaintiffs' claims for lack of standing and cannot exercise supplemental jurisdiction over the plaintiffs' state law claims. Therefore, the plaintiffs' state law claims, counts five to eight, are **dismissed without prejudice**.

**IV.**

The defendants have also moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because the defendants' Rule 12(b)(1) motion is granted and the plaintiffs' case is dismissed for want of standing, the Court does not address the defendants' 12(b)(6) arguments.

## CONCLUSION

The defendants' motion to dismiss the plaintiffs' complaint is **granted** and the plaintiffs' complaint is **dismissed without prejudice for lack of jurisdiction**. The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The Clerk of Court is directed to close all open motions on the docket and to close this case.

**SO ORDERED.**

**Dated:**     **New York, New York**
               **May 1, 2019**

                                        */s/ John G. Koeltl*
                                        **John G. Koeltl**
                                   **United States District Judge**